1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| Great Western Air, LLC d/b/a Cirrus Aviation Services, LLC, | Case No. 2:16-cv-02656-DJA |
| Plaintiff/Counter-Defendant, | **Findings of Fact, Conclusions of Law, and Judgment Following Bench Trial** |
| v. | |
| Cirrus Design Corporation, | |
| Defendant/Counter-Claimant. | |

This is a trademark infringement case arising out of a dispute between a high-end airplane charter company—Great Western Air, LLC dba Cirrus Aviation Services, LLC ("Cirrus Aviation")—and a personal airplane manufacturer—Cirrus Design Corporation ("Cirrus Aircraft")—that share the same name. Cirrus Aviation sues Cirrus Aircraft for declaratory relief that its name does not infringe on Cirrus Aircraft's trademark of the single word CIRRUS and that it has not engaged in unfair competition.

Cirrus Aircraft counterclaims, arguing that Cirrus Aviation has infringed on its trademark and engaged in unfair competition under federal, state, and common law. Cirrus Aircraft also asks the Court to impose a permanent injunction to keep Cirrus Aviation from using the name, to disgorge Cirrus Aviation of profits attributable to its use of the name, and to require Cirrus Aviation to pay Cirrus Aircraft's attorneys' fees. The parties engaged in a four-day bench trial and, based on the testimony presented, the exhibits, and briefing, the Court finds that Cirrus Aircraft has not met its burden of proving its claims by a preponderance of the evidence and thus has not shown it is entitled to damages or injunctive relief. The Court enters judgment in favor of Cirrus Aviation and against Cirrus Aircraft and closes this case.

1

**Findings of Fact**

2    Cirrus Aviation is a charter airline catering to "the one percent of the one percent."[1]

3    Passengers aboard a Cirrus Aviation flight experience the lofty luxury of picking when they

4    would like to fly, avoiding the lines and traffic of commercial airlines, having the plane all to

5    themselves, and taking advantage of opulent onboard amenities.[2]  Prices are, fittingly, sky high.

6    Passengers can expect to pay between $8,000 and $340,000 per trip.[3]  Cirrus Aviation even offers

7    to help customers purchase their own plane to keep in Cirrus Aviation's fleet.[4]  Cirrus Aviation

8    provides the pilot, maintenance, management, and storage.[5]  And when the owner is not using the

9    plane, Cirrus Aviation uses it to fly other customers and the owner earns money in return.[6]

10    Cirrus Aircraft is a successful plane manufacturer.  It makes planes for people who love to

11    fly, not as passengers, but as pilots.[7]  It builds three models: the SR20, the SR22, and the Vision

12    Jet.[8]  Its planes seat between four and seven people, cost between $1 million and over $3 million,

13    and are the only planes in the industry to include a parachute for the entire plane.[9]  Since their

14    introduction, Cirrus Aircraft's planes have soared in popularity.  The SR series has been the most

15    popular single engine aircraft for twenty years and the Vision Jet has been the most-delivered

16    business jet for three years.[10]  To encourage non-pilots to consider plane ownership, Cirrus

17    Aviation has created programs through which it finds pilots to fly the owners' planes and teach

18

19

---

20    [1] ECF No. 173 at 61:23-62:13.

21    [2] *Id.* at 62:16-25, 91:20-92:17, 94:4-96:11.

22    [3] *Id.*

      [4] *Id.* at 63:1-68:8.

23    [5] *Id.*

24    [6] *Id.*

25    [7] ECF No. 175 at 190:6-19.

26    [8] ECF No. 108 at 3.

27    [9] ECF No. 175 at 229:15-21; ECF No. 174 at 64:13-69:12, 73:16-20, 117:20-121:14, 161:18-20; ECF No. 108 at 3.

28    [10] ECF No. 174 at 125:14-19, 126:11-22.

the owners how to fly.[11]  It also offers plane management, maintenance, and storage solutions to make plane ownership a breeze.[12]

The trouble is, both companies have practically the same name.  Their shared name—cirrus—is a type of cloud.  A high-altitude, wispy looking cloud.  The appearance of which indicates calm skies and excellent flying weather.  But the little cloud has led to a turbulent relationship between Cirrus Aviation and Cirrus Aircraft.

## I.    Cirrus Aircraft's history

Midwestern-raised brothers, Alan and Dale Klapmeier, grew up around aviation.  Their grandfather owned planes and their uncle was a pilot.[13]  Older brother Alan first caught the aviation bug, and his younger brother Dale followed suit.[14]  The brothers' parents even got their own pilots' licenses, deciding that they would not let their sons fly until they knew how to do it first.[15]  The brothers learned to fly in their family's plane and eventually began fixing up their own.[16]  They later graduated to building kit planes, which are sold unassembled so enthusiasts can put them together themselves.[17]

One year, while the brothers were on break from college, they decided to fly from their family farm in Wisconsin to see their grandparents in Chicago.[18]  They called the flight service for a weather update and were disappointed to learn that storms were expected, and flying was not recommended.[19]  Their disappointment only grew when, as they were driving to Chicago, they

---

[11] ECF No. 175 at 204:4-205:15; ECF No. 174 at 85:12-88:12, 140:24-142:10, 162:3-15, 175:18-176:14; Exs. 63, 67-76, 78.

[12] ECF No. 174 at 140:24-142:10, 162:3-15, 173:5-14.

[13] *Id.* at 49:11-50:18.

[14] *Id.* at 50:1-14.

[15] *Id.*

[16] *Id.* at 50:20-25, 53:3-22.

[17] *Id.* at 50:20-25, 53:3-22, 55:2-12.

[18] *Id.* at 56:9-57:8.

[19] *Id.*

looked up not to see storm clouds, but feathery cirrus clouds against a blue sky.[20]  It was excellent flying weather.  During that begrudging drive, the two decided to create their own aviation company, and to name it after the cirrus clouds that mocked them as they drove.[21]

At the 1987 Oshkosh Air Show, the Klapmeier brothers unveiled their first Cirrus plane: a kit plane that bragged to be the fastest, biggest, and coolest kit plane on the market.[22]  But the pair quickly learned that, while people loved the design of the plane, not everyone wanted to build their own.[23]  So the brothers found a financial backer and began designing their first ready-made airplanes.[24]  As part of that process, in 1994, Alan applied for a trademark of the name CIRRUS for use in aircraft and structural parts.[25]  Later, the company would expand the mark for use in avionics, aircraft inspection and repair, flight instruction and training, aircraft financing, aircraft sales and acquisition, aircraft maintenance, aircraft insurance, and aircraft management, amongst others.[26]

In 1993, the brothers began marketing their new planes in teaser-style advertisements that hinted at the "Mystery of Hangar X."[27]  And at the July 1994 Oshkosh Airshow, they unveiled their ready-made planes, including the mystery plane: the SR20.[28]  By about 2000, the SR series was a bestseller.[29]  By 2011, a foreign entity purchased the company.[30]  And by about 2019, the Vision Jet became the most-delivered turbo jet.[31]  Cirrus Aircraft had taken off.

---

[20] *Id.*

[21] *Id.*

[22] *Id.* at 57:10-58:8.

[23] *Id.* at 60:8-17.

[24] *Id.* at 60:8-63:5.

[25] Ex. 1 at 001.

[26] Exs. 1, 2; ECF No. 176 at 31:4-14, 32:1-10.

[27] ECF No. 174 at 61:5-63:20.

[28] *Id.* at 63:2-64:12.

[29] *Id.* at 125:12-20.

[30] *Id.* at 106:1-3.

[31] *Id.* at 125:12-20.

## II.      Cirrus Aircraft discovers Cirrus Aviation

Years later, in 2014, Cirrus Aircraft was surprised to learn that another company was using its name.  Todd Simmons—Cirrus Aircraft's executive vice president of sales, marketing, and support—had stumbled across Cirrus Aviation's website, cirrusav.com.[32]  Concerned, he sent the website link to others in the company, asking them to investigate.[33]

This was not the first time another company had used the name Cirrus.  But certain of the other companies were less concerning to Cirrus Aircraft because of their limited offerings and limited geographic presences.[34]  Cirrus Flight Operations, a Minnesota corporation, had been using the name even before Cirrus Aircraft.[35]  It offered a variety of aviation services from a small airport in Blaine, Minnesota—including operating charter flights—starting in 1978.[36]  Currently, it offers charter broker services in which it acts as a middleman, connecting charter clients with charter operators.[37]  Cirrus Aviation, Inc.—with locations in New Jersey and Arizona—buys and sells turbine engines and related equipment.[38]  Cirrus Aviation, Incorporated—based in Florida—operates a flight training company and pilot shop.[39]  And an entity in Oregon once called Alan Klapmeier to discuss using the name Cirrus for a flight school.[40]

---

[32] Ex. 82; ECF No. 174 at 185:9-22.

[33] Ex. 82; ECF No. 174 at 185:9-22.

[34] ECF No. 176 at 41:8-43:23.

[35] ECF No. 175 at 125:25-126:7.

[36] *Id.* at 125:17-139:21.

[37] ECF No. 173 at 53:22-55:4; ECF No. 175 at 125:25-126:3.

[38] Ex. 1208-B at 40:8-11, 42:8-20.

[39] Ex. 1208-A at 9:13-15, 10:2-18, 30:9-11.

[40] ECF No. 175 at 214:15-215:8.

Unlike these entities, Cirrus Aviation's use of the name troubled Cirrus Aircraft.[41]  So, shortly after discovering its website, Cirrus Aircraft sent a cease-and-desist letter to Cirrus Aviation, asking it to cease using the Cirrus name.[42]  Cirrus Aviation refused.

### III.    Cirrus Aviation's history

Cirrus Aviation insists that its use of the Cirrus name began organically and much in the same way that Cirrus Aircraft's did: a fondness for the little cloud that promises good flying weather.  The company is family-owned by Milt Woods and his sons, Greg and Mark.[43]  Milt had been a commercial pilot since the sixties and, in 1994, decided to start his own aircraft management company.[44]  He named his company Cirrus Aviation Services, Inc. after the wispy, promising cloud with which he was no doubt familiar through his commercial piloting career.[45]  At this point, neither Milt, Greg, nor Mark knew about Cirrus Aircraft.[46]

Milt used the company to engage in the charter market a few different ways between 1994 and 2010.  He started by operating a Canadian charter company, then became part owner of a Las Vegas-based charter company in the early 2000s.[47]  Neither company operated under the Cirrus name.

Eventually, Milt switched gears and, through Cirrus Aviation Services, Inc., began brokering charter flights.[48]  But brokering charter flights is not the same as offering them.  Eventually, joined by his sons, Milt set his sights higher: on becoming a charter operation.[49]

---

[41] ECF No. 176 at 41:8-43:23, 51:22-52:13.

[42] Ex. 1015.

[43] Ex. 1000.

[44] ECF No. 173 at 47:8-16.

[45] *Id.*

[46] Ex. 164-A at 41:16-42:21; Ex. 165-A at 51:6-14; ECF No. 173 at 134:11-16.

[47] ECF No. 173 at 47:8-48:5, 53:6-14, 131:14-22, 209:6-22.

[48] *Id.* at 53:20-54:2.

[49] *Id.* at 55:5-7.

Obtaining the certificate—called a Part 135 certificate—required by the Federal Aviation Agency ("FAA") to operate charter flights is no simple task.[50]  To simplify the process, in 2010, the Woods family decided to purchase a company that already had its Part 135 certificate.[51]  The company—named Great Western Air, LLC—was owned by an individual who had multiple companies under the same name.[52]  Because he still had his other companies, Great Western Air's owner asked the Woods family to choose a different name, to which they agreed.[53]  The family decided to name the company Cirrus Aviation Services, LLC because Milt was proud of the name, liked the cloud, and wanted to keep it to maintain his customer base.[54]

Before making that decision, Greg looked through the Air Charter Guide to see if any other Part 135 airlines were using the name but did not check whether the name was trademarked.[55]  Greg did not find any other uses of Cirrus by Part 135 operators.[56]  But by 2010, the Woods family was already aware of Cirrus Aircraft.[57]  They simply did not think Cirrus Aircraft's use of the name was a concern because Cirrus Aircraft made small piston airplanes, rather than the commercial aircraft in which the Woods family was interested.[58]

Having settled on a name, Cirrus Aviation offered its first charter flight in February of 2010.[59]  In 2014, it received Cirrus Aircraft's cease-and-desist letter.  And in 2016, Cirrus Aviation sued Cirrus Aircraft, asking the Court to enter declaratory judgment that its name does not infringe on Cirrus Aircraft's mark and that it had not engaged in unfair competition.[60]

---

[50] *Id.* at 56:9-18.

[51] *Id.* at 55:12-15.

[52] *Id.* at 57:19-25.

[53] *Id.* at 57:22-58:21.

[54] *Id.* at 57:22-58:21, 208:11-14.

[55] *Id.* at 57:22-58:21.

[56] *Id.* at 207:11-21.

[57] *Id.*

[58] *Id.*

[59] *Id.* at 133:24-134:1.

[60] ECF No. 1.

1

**Conclusions of Law**

2

**I.      Theories of liability**

3

        Cirrus Aviation asks the Court to issue a declaration that it has not infringed on Cirrus

4

Aircraft's trademark of the word CIRRUS and that Cirrus Aviation's use of that name is not

5

unfair competition.  Cirrus Aircraft asks the Court to find that Cirrus Aviation infringed on its

6

trademark and engaged in unfair competition under the Lanham Act, the Nevada Deceptive Trade

7

Practices Act, and common law.  The analysis for each theory is the same.[61]

8

        The test asks: (1) whether the plaintiff has a protectable ownership interest in the mark;

9

and (2) whether the defendant's use of the mark is likely to cause consumer confusion.[62]  Here,

10

the parties do not dispute Cirrus Aircraft's protectable interest in the mark.  They dispute whether

11

Cirrus Aviation's use of that mark is likely to cause consumer confusion.

12

        Likelihood of confusion in the Ninth Circuit depends on eight factors: (1) strength of the

13

mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion;

14

(5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the

15

purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the

16

product lines.[63]  Not every factor carries equal weight.[64]  The Ninth Circuit has explained that

17

courts should consider the factors together to decide if, under a totality of the circumstances, a

18

likelihood of confusion exists.[65]

19

20

21

22

23

24

[61] *See M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir. 2005); *see New West Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979); *see Mayweather v. Wine Bistro*, No. 2:13-cv-210-JAD-VCF, 2014 WL 6882300, at *6 (D. Nev. Dec. 4, 2014).

25

[62] *See Ironhawk Technologies, Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1159 (9th Cir. 2021).

26

[63] *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

27

[64] *See Thane Int'l Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002).

28

[65] *See Ironhawk*, 2 F.4th at 1161.

Using these factors, Cirrus Aircraft must prove by a preponderance of the evidence that Cirrus Aviation's use of the mark is likely to cause confusion.[66]  The Court finds that Cirrus Aircraft has not met this burden of proof.  It thus enters judgment in favor of Cirrus Aviation.

### A.    Strength of the mark

Trademark law offers greater protection to marks that are "strong," meaning, "distinctive."[67]  Courts in the Ninth Circuit analyze a mark's strength in terms of conceptual strength and commercial strength.[68]  Conceptual strength depends on the obviousness of a mark's connection to the good or service to which it refers.[69]  Commercial strength is based on actual marketplace recognition.[70]

### 1.    Conceptual strength

Conceptual strength exists along a spectrum of five categories ranging from strongest to weakest.[71]  Generic marks—like "Light Beer"—are not eligible for trademark protection.[72]  Descriptive marks—like "speedy," "friendly," or "green"—are not entitled to trademark protection unless they have acquired secondary meaning.[73]  Suggestive marks—like "Roach Motel" insect trap—suggest a product's features and require consumers to exercise some

---

[66] *See Stone Creek Incorporated v. Omnia Italian Design Incorporated*, No. cv-13-00688-PHX-DLR, 2018 WL 1784689, at *1, n.2 (D. Ariz. April 12, 2018) *aff'd*, 808 F. App'x 459 (9th Cir. 2020); NINTH CIRCUIT MANUAL OF MODEL OF CIVIL JURY INSTRUCTIONS § 15.6 (2020) (addressing the elements and burden of proof for trademark infringement under 15 U.S.C. § 1114(1)).

[67] *Ironhawk*, 2 F.4th at 1162.

[68] *JL Beverage Company, LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106-1107 (9th Cir. 2015).

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *See Brookfield Communications, Inc. v. West Coast Entertainment Corp*, 174 F.3d 1036, 1058 n. 19 (9th Cir. 1999); *see Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977).

[73] *See Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114 (9th Cir. 2010); *see Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 845 (5th Cir. 1990).

imagination to associate the suggestive mark with the product.[74]  They are thus often entitled to trademark protection.[75]  Arbitrary marks—like "Black and White" scotch whiskey—are made up of words commonly used in the English language but are entitled to federal trademark protection because they serve to identify a particular source of a product.[76]  Fanciful marks—like "Clorox"—are made up terms and are automatically entitled to trademark protection.[77]

In *American Home Products Corp. v. Johnson Chemical Co., Inc.*, the Second Circuit Court of Appeals explained that "Roach Motel" is at least a suggestive mark because it invokes the idea of a "fanciful abode for roaches."[78]  The image was significant in relation to the design of the product, an open-ended box containing an attractant for bugs and a sticky adhesive to prevent the bug from escaping.[79]  The trap was shaped to prevent the bug from leaving—even if not stuck on the adhesive—and used the slogan, "Roaches Check In…But They Don't Check Out," to reinforce the "motel" theme.[80]

The Ninth Circuit discussed the arbitrary nature of "Black & White" scotch whisky in *Fleischmann Distilling Corp. v. Maier Brewing Co.*[81]  It explained that the term was not descriptive of the whisky, nor did the whisky have anything to do with the qualities of black and white.[82]  Having no relation to whisky, the court concluded that, used in the alcoholic beverage industry, the name "Black and White" had come to mean a particular brand of whisky.[83]

---

[74] *See Brookfield Comm.*, 174 F.3d at 1058 n. 19; *see American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103 (2d Cir. 1978).

[75] *See Zobmondo*, 602 F.3d at 1113.

[76] *See Brookfield Comm.*, 174 F.3d at 1058 n. 19; *see Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 154 (9th Cir. 1963).

[77] *See Zobmondo*, 602 F.3d at 1113; *see Clorox Chemical Co. v. Chlorit Mfg. Corporation*, 25 F.Supp. 702, 205 (E.D.N.Y. 1938).

[78] *See American Home Prods.*, 589 F.2d at 107.

[79] *See id.* at 104.

[80] *Id.* at 104-105.

[81] *See Fleischmann Distilling Corp.*, 314 F.2d at 153-54.

[82] *See id.*

[83] *See id.*

Here, the "Cirrus" mark is on the strong end of the spectrum, falling in between suggestive and arbitrary.  Cirrus Aircraft argues that its mark is arbitrary: a common word but identifying a particular source of airplanes.  Cirrus Aviation argues that the mark is suggestive: requiring consumers to exercise their imagination to associate a cloud with air travel.  The mark falls somewhere in the middle.

The "Cirrus" mark is more than suggestive when compared with "Roach Motel."  "Roach Motel" suggested a trap that bugs would enter through an opening, much as a person might enter a motel through a doorway.  The term suggested the single-opening feature of the trap.  But Cirrus Aircraft has provided no evidence that "Cirrus" suggests any features of Cirrus Aircraft's planes.  While the term could suggest that the plane flies amongst cirrus clouds, that suggestion is less obvious than "Roach Motel" insect traps, which were designed and marketed to invoke a motel.

On the other hand, the "Cirrus" mark is not entirely arbitrary to airplanes like "Black & White" is to whisky.  While not descriptive of the plane itself, cirrus clouds are indicative of good flying weather.  The term "cirrus," as used in the aviation industry, thus does not *only* mean a particular brand of plane.

Despite falling between two of the spectrum's guideposts, the mark still falls on the stronger end of the spectrum.  The mark is thus conceptually strong.  But the Court must still consider that strength in context of the market in which it is used.

### 2.    Commercial strength.

Commercial strength refers to market presence and can be supported by evidence of advertising expenditures, which increase that presence.[84]  Evidence of commercial strength can strengthen an otherwise conceptually weak mark.[85]  But use of similar marks by third-party companies in the relevant industry can weaken it.[86]

---

[84] *See JL Beverage*, 828 F.3d at 1107.

[85] *Brookfield Comm.*, 174 F.3d at 1058.

[86] *M2 Software, Inc.*, 421 F.3d at 1087-8.

Here, other uses of the "Cirrus" mark in the aviation industry broadly, and in the charter industry specifically, weaken the mark in context.  In support of its contention that it maintains a strong market presence, Cirrus Aircraft introduced evidence of the awards it has won,[87] articles about its success,[88] its advertisements,[89] its founders' induction into the National Aviation Hall of Fame,[90] and testimony from its president about how certain of its planes have been bestsellers in their categories for years running.[91]  It also introduced evidence that it spends up to $10 million a year in marketing.[92]  But given the testimony at trial that charter flights and personal aircraft attract different types of customers, the Court is not convinced that strength in the personal aircraft market equates entirely to strength in the charter market.  It is not clear that charter customers would be interested in the success of a personal aircraft.[93]  And although Cirrus Aircraft introduced evidence that some charter companies have Cirrus Aircraft planes in their fleets,[94] it did not offer evidence showing how much of the charter market its planes occupy or what type of advertising it has done in that market.

Additionally, Cirrus Aviation has introduced evidence that three other companies in the aviation market use the name Cirrus, one of which used it in charter.[95]  Cirrus Aircraft described these companies as geographically limited "mom-and-pop" operations and noted that it is not

---

[87] Ex. 29.

[88] Ex. 30; Ex. 37.

[89] Ex. 35; Ex. 39.

[90] Ex. 36.

[91] ECF No. 174 at 125:12-126:24.

[92] ECF No. 176 at 87:22-25.

[93] *Compare* ECF No. 173 at 62:9-25 (Greg Woods explaining that customers of their charter flights choose to get into the back of an airplane and the efficiency for which they choose to take charter as opposed to commercial flights) *with* ECF No. 175 at 190:6-19 (Alan Klapmeier explaining that the concept of "owner flown" was part of the philosophy and market for Cirrus Aircraft).

[94] Ex. 152; ECF No. 175 at 32:14-16.

[95] ECF No. 175 at 127:22-128:9 (Cirrus Flight Operations); *id.* at 214:15-215:8 (a Cirrus flight school); Ex. 1208-B at 40:8-11, 42:8-20 (Cirrus Aviation, Inc.); Ex. 1208-A at 9:13-15, 10:2-18, 30:9-11 (Cirrus Aviation Incorporated).

1   required to litigate every use of its mark.  Even so, evidence of these companies weakens the

2   Cirrus mark's commercial strength, albeit less so than if they were larger companies.  Taking the

3   conceptual strength of the mark together with its commercial weakness, the Court finds that this

4   factor is neutral in the analysis.

5   **B.      Proximity of the goods**

6   Goods and services are related when they are complementary, similar in use or function,

7   or sold to the same class of purchasers.[96]  The plaintiff need not establish that the parties are

8   direct competitors.[97]  Instead, the Ninth Circuit has adopted a flexible approach to the notion of

9   competition.[98]  Under that approach, related goods or services are those which would reasonably

10  be thought by the buying public to come from the same source if sold under the same mark.[99]

11  The proximity of the goods also becomes less important where consumers exercise a great deal of

12  care because, "rather than being misled, the consumer would merely be confronted with choices

13  among similar products."[100]

14  Here, while Cirrus Aircraft's planes and Cirrus Aviation's flights are complementary and

15  similar in use and function, they are not sold to the same class of purchasers.  Cirrus Aircraft has

16  produced evidence that its planes and Cirrus Aviation's flights are complementary by

17  demonstrating that other charter companies have Cirrus Aircraft's planes in their fleets.[101]  And

18  on the surface, Cirrus Aircraft's planes and Cirrus Aviation's flights are similar in use and

19  function: using aircraft to transport passengers.

20  But Cirrus Aircraft's planes and Cirrus Aviation's flights are sold to different classes of

21  purchasers.  Of course, both classes of purchasers are presumably very wealthy.  But Cirrus

22

23  [96] *Ironhawk*, 2 F.4th at 1163.

24  [97] *Id.*

25  [98] *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212-13 (9th Cir. 2012).

26  [99] *Rearden.*, 683 F.3d at 1212-13.

27  [100] *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011).

28  [101] Ex. 152 at 1-5.

Aircraft's purchasers largely want to be pilots.[102]  And Cirrus Aviation's purchasers largely want to be passengers.[103]

The difference between the two companies' class of purchasers weakens the complementary nature of Cirrus Aircraft's planes and Cirrus Aviation's flights.  Even when Cirrus Aircraft's planes are part of charter fleets—and thus complementary to the charter service Cirrus Aviation offers—Cirrus Aircraft's class of purchasers are charter companies, not individuals.  Other charter companies are not buying flights from Cirrus Aviation.  They are its direct competitors.

The difference between the two companies' class of purchasers also weakens the similarity in use and function of Cirrus Aircraft's planes and Cirrus Aviation's flights.  While on the surface the two companies both offer a way to fly in a private or semi-private plane, the two companies offer different experiences to purchasers.  Cirrus Aviation's typical purchasers prioritize the convenience of charter flights.[104]  On the other hand, Cirrus Aircraft's typical purchasers are pilots for whom plane ownership involves significantly more responsibilities, like qualifying to fly the plane, maintaining it, and housing it in an appropriate hangar.[105]

The difference between the classes of purchasers also weakens the similarity in use and function of Cirrus Aviation and Cirrus Aircraft's ancillary services.  Both companies offer airplane acquisition, airplane maintenance, airplane management, and pilot training services.[106] But both companies only offer these services to existing customers (or in the case of Cirrus Aviation's pilot training, to potential employees) not to the public.

---

[102] ECF No. 175 at 190:6-19, 194:5-12.

[103] ECF No. 173 at 62:16-25.

[104] *Id.*

[105] ECF No. 174 at 31:2-19, 85:16-86:1; 141:11-142-10.

[106] ECF No. 173 at 63:1-66:5 (Cirrus Aviation's aircraft acquisition, management, and maintenance services); *id.* at 110:13-111:10 (Cirrus Aviation's pilot training program); ECF No. 174 at 85:15-86:4 (Cirrus Aircraft's pilot training program); *id.* at 141:3-142:25 (Cirrus Aircraft's airplane management and maintenance program).

Because the two companies have different classes of purchasers, the complementary nature of their respective planes and flights is lessened, and their use and function are more dissimilar.  Under the Ninth Circuit's flexible approach, the Court cannot find that Cirrus Aircraft's planes and Cirrus Aviation's flights would reasonably be thought by the buying public to come from the same source.  This factor weights in favor of Cirrus Aviation.

### C.    Similarity of the marks

Similarity of marks is judged by appearance, sounds, and meaning.[107]  Similarities are weighed more heavily than differences.[108]  The marks must be considered in their entirety and as they appear in the marketplace.[109]

Here, the marks' similarities outweigh their differences.  The marks are nearly identical in appearance and sound.  As Cirrus Aircraft pointed out, the first word is entirely identical, while the second is similar because both start with "a" and pertain to the aviation industry.[110]  They are also similar in appearance and sound as they appear in the marketplace because Cirrus Aviation often shortens its name on its website and promotional materials to "Cirrus."[111]

On the other hand, there are some differences.  The articles about Cirrus Aviation which Cirrus Aircraft uses as evidence of the company using the single word "Cirrus" show that the articles use the term in context.  They initially identify the company as "Cirrus Aviation" and then use the single term "Cirrus" as a shorthand.[112]  Cirrus Aviation also does not put its logos on or anywhere inside its planes, unlike the way Cirrus Aircraft displays its mark.[113]  And while the term "Cirrus" is identical between both companies, the terms that follow imply slight differences. "Aircraft" implies the actual plane, while "aviation" implies something related to flying more

---

[107] *Ironhawk*, 2 F.4th at 1164-65.

[108] *Id.*

[109] *Id.*

[110] ECF No. 175 at 65:25-66:24.

[111] Ex. 159; Ex. 84; Ex. 136; Ex. 163; ECF No. 175 at 66:6-10.

[112] Ex. 84; Ex. 136; Ex. 163.

[113] ECF No. 173 at 84:12-86:2.

generally.  Nonetheless, because similarities are weighed more than differences, and because the differences are so slight, this factor weighs in favor of Cirrus Aircraft.

### D.   Evidence of actual confusion

Evidence of actual confusion is strong evidence of likelihood of confusion.[114]  Because finding this evidence is hard, the failure to prove actual confusion is not dispositive.[115]  This factor is heavily weighed only when there is evidence of past confusion or perhaps when the particular circumstances indicate that evidence should have been available such as when two similar marks have coexisted for some time.[116]  "The test for likelihood of confusion is whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks…[t]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally."[117]

The Ninth Circuit's decision in *Rearden LLC v. Rearden Commerce, Inc.* stands for the proposition that non-consumer confusion is relevant to the likelihood of confusion in three scenarios: (1) if that confusion could turn into actual consumer confusion, like in the case of potential customers; (2) if that confusion could create an inference of consumer confusion by serving as a proxy or substitute for evidence of actual consumer confusion; or (3) if that confusion could contribute to consumer confusion by influencing consumer perception and decision making.[118]  In *Rearden*, a group of related entertainment, technology, and production companies using "Rearden" in their name (the "Rearden Companies") sued a concierge company named "Rearden Commerce" for trademark infringement.[119]  The district court granted summary judgment in favor of Rearden Commerce.[120]  The Ninth Circuit remanded, finding that questions

---

[114] *Ironhawk*, 2 F.4th at 1165-66.

[115] *Id.*

[116] *Id.*; *see Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002).

[117] *Rearden*, 683 F.3d at 1213-19 (internal citations and quotations omitted).

[118] *Id.*

[119] *Id.* at 1195-97.

[120] *Id.* at 1202.

of fact remained, particularly regarding non-consumer evidence of confusion and the "very real possibility that confusion on the part of at least certain non-consumers could" fall under the three scenarios where that confusion is relevant.[121]

In analyzing the Rearden Companies' confusion evidence, the court first acknowledged the Rearden Companies' evidence of consumer confusion.[122]  One instance involved a customer expressing confusion as to which "Reardon" it was conducting business with.[123]  Others involved emails that Rearden Commerce's customers accidentally sent to the Rearden Companies.[124]

The court then analyzed non-consumer confusion which it asserted could fall into any one of the three categories.[125]  Trade publications had confused the two companies and one article observed that "the main question in the conference hallways [at the PC Forum trade show] was whether the company [Rearden Commerce] had any relationship with [one of the Rearden Companies]…"[126]  A Rearden Commerce employee admitted in his deposition that he was asked "about a dozen times" in a trade show whether the companies were somehow affiliated.[127]  While the court explained that the evidence could fall under any one of the three non-consumer confusion categories, "[i]n particular, it appears that the confusion of presumably knowledgeable and experienced trade journalists and trade show organizers could very well influence the purchasing decisions of consumers."[128]

Next, the court analyzed evidence of non-consumer confusion from individuals in a position to influence consumers or serve as their proxy.[129]  It noted that prospective employees

---

[121] *Id.* at 1216-17.

[122] *Id.* at 1217.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 1217-18.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Id.*

for the Rearden Companies, a vendor, and even an investor that had previously contracted with Rearden Commerce and was later negotiating with the Rearden Companies had all expressed confusion.[130]   Additionally, sophisticated parties like the Rearden Companies' auditors and even their patent attorneys had demonstrated confusion.[131]   Rearden Commerce's public relations consultant had even written an email that the existence of the Rearden Companies "might confuse folks in the beginning."[132]   Ultimately, based on this evidence, the court found that genuine issues of material fact existed with respect to the evidence of actual confusion factor.[133]

Here, Cirrus Aircraft has not produced strong evidence of actual confusion, despite the thirteen years the two companies have co-existed.  And while Cirrus Aircraft has produced evidence of actual confusion, nearly all of it consists of non-consumer confusion.  It is not apparent from this evidence that a reasonably prudent consumer in the marketplace is likely to be confused about the origin of their charter flight or personal aircraft.

As a preliminary matter, unlike the Reardon Companies' multiple pieces of evidence of consumer confusion, Cirrus Aircraft has only offered two instances of confusion by a consumer, one of which is not clearly confusion.  One involved a Cirrus Aircraft customer calling Cirrus Aviation looking for maintenance on their Cirrus Aircraft plane.[134]   This is just like the misdirected customer emails in *Rearden* and is straightforwardly consumer confusion.

The other, however, is not so straightforward.  It involved a Cirrus Aircraft customer and influential pilot—Lt. Col. Dan Rooney—posting a picture of his Cirrus Aircraft plane, but tagging Cirrus Aviation's Instagram handle, @cirrusav.[135]   This is not straightforward confusion because neither party submitted evidence showing whether Lt. Col. Rooney was actually confused, made a typo, or intended to tag Cirrus Aviation.  And while many of the other social

---

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.* at 1218-19.

[134] ECF No. 175 at 70:24-71:12.

[135] Ex. 101; ECF No. 176 at 115:8-117:2.

media posts Cirrus Aircraft entered into evidence appear to depict consumers, the Court received no evidence confirming that.[136]

The rest of Cirrus Aircraft's confusion evidence is from non-consumers. But that evidence is weaker than that in *Rearden*. One article included a disclaimer that Cirrus Aviation is not the manufacturer of Cirrus Aircraft's Vision Jet.[137] But this is weaker than the evidence of trade publications that confused the two companies in *Rearden*. Although the disclaimer appears intended to prevent confusion, the inference that Cirrus Aircraft asks the Court to draw—that consumers would have been confused without it—is too attenuated. Comedian Rob Riggle kicked off the National Business Aviation Association 2021 event and erroneously referred to Cirrus Aviation as the company that flew him to the event, rather than Cirrus Aircraft.[138] But while nearly all attendees likely heard this comedian's jokes, the Court received no evidence that the difference between Cirrus Aviation and Cirrus Aircraft then became "the main question in the conference hallways" like the conferences in *Rearden*. And the Court has received no evidence that Mr. Riggle is knowledgeable and experienced enough to influence the purchasing decision of consumers like the trade show organizers and trade journalists were in *Rearden*.

Cirrus Aircraft's remaining non-consumer confusion evidence could fall into the last two categories—coming from those in a position to influence customers (social media posts) or serve as their proxy (vendor emails)—but is still weak evidence. Cirrus Aircraft offered multiple social media posts depicting its planes but tagging Cirrus Aviation's social media handle—@cirrusav— or including hashtags appearing to reference Cirrus Aviation—like #cirrusaviation.[139] But unlike the court in Rearden, which had the benefit of knowing that prospective employees, a vendor, an investor, auditors, and attorneys had expressed confusion, here, the Court lacks information about the people making the social media posts. It is unclear what, if any, association these people have

---

[136] Exs. 101-129, 131-133.

[137] Ex. 137.

[138] Ex. 139.

[139] Exs. 101-129, 131-133.

with Cirrus Aircraft or if they are even people at all, as opposed to bots.[140]  Without more information about these people (or bots) and their intent in using the Cirrus Aviation handle and hashtags, the Court cannot speculate that they were actually confused between the companies. And while people viewing these posts might conceivably become confused, the Court again would have to speculate about this because it has not received any evidence that this has happened, let alone that it has happened to a consumer.

Finally, Cirrus Aircraft has offered evidence of vendor confusion.  Keith Baulsir—senior director of global partnerships for the Las Vegas Golden Knights—emailed Ben Kowalski— senior vice president of sales and marketing for Cirrus Aircraft—believing him to be associated with Cirrus Aviation.[141]  An account executive with Trustpilot also reached out to principals for both companies on the same email, asking if Cirrus Aviation would be interested in using Trustpilot to boost its web traffic.[142]  But these two emails, even with the social media posts, are not as strong as the evidence of a vendor, an investor, auditors, and attorneys who were confused in *Rearden*, particularly considering the thirteen years that Cirrus Aviation and Cirrus Aircraft have co-existed.  This factor weighs in favor of Cirrus Aviation.

### E.  Marketing channels used

This factor asks whether the parties' marketing channels, consumer basis, and how they advertise their products overlap.[143]  The Ninth Circuit has recognized that similar webpages might exacerbate the likelihood of confusion.[144]  But on the other hand, "[i]t would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."[145]

---

[140] A bot is short for "robot" and refers to a computer program that mimics the actions of a person, often to perform malicious actions.  *See Bot*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/bot (last visited January 4, 2022).

[141] Ex. 14.

[142] Ex. 12.

[143] *Ironhawk*, 2 F.4th at 1166.

[144] *Brookfield Comm.*, 174 F.3d at 1057.

[145] *Network Automation, Inc.*, 638 F.3d at 1151.

Cirrus Aircraft and Cirrus Aviation's marketing channels do not appear to significantly overlap.  While both parties presented evidence that certain of their marketing is the same type—referrals and websites—the Court is not convinced that these constitute the same channels.  Both parties having websites is not enough to demonstrate that they use the same marketing channels, especially because it is not clear that either party relies heavily on its site for sales.  Over half of Cirrus Aircraft's sales are attributable to referrals.[146]  About 70% of Cirrus Aviation's flights are sold to charter brokers while about 20% are sales controlled through business intermediaries.[147] Thus, while having similarly named and looking websites might result in a person going to the wrong website, the Court is not convinced that the misdirection would result in a mistaken sale. Additionally, given the different things each party offers—a plane ticket versus a plane itself—it is not obvious that their referral networks would overlap.  And the Court has not received compelling evidence that they do.  Although over a hundred of Cirrus Aircraft and Cirrus Aviation's customer's names are similar, the Court has received no evidence that confirms that the Michael Smith on Cirrus Aviation's customer list is the same person as the Michael Smith on Cirrus Aircraft's.[148]  This factor weighs in favor of Cirrus Aviation.

**F.      Type of goods and the degree of care likely to be exercised by the purchaser**

The sixth *Sleekcraft* factor requires the court to assess the customers' sophistication and ask whether a reasonably prudent customer would take the time to distinguish between the two product lines.[149]  When the goods are expensive, the buyer can be expected to exercise greater care in his purchases.[150]  The same is true if the goods are marketed primarily to expert buyers.[151]

The Court finds this factor to weigh in Cirrus Aviation's favor because Cirrus Aircraft's planes and Cirrus Aviation's flights are both very expensive and marketed to expert buyers.

---

[146] ECF No. 176 at 122:8-17.

[147] ECF No. 173 at 87:12-88:7.

[148] Ex. 157 at 005.

[149] *Ironhawk*, 2 F.4th at 1167.

[150] *Id.* (internal citations and quotations omitted).

[151] *Brookfield Comm.*, 174 F.3d at 1060.

Cirrus Aviation's flights range from about $8,000 to about $340,000 per flight.[152]  A Cirrus Aircraft plane costs between $1 million and over $3 million.[153]  It is unlikely a buyer—particularly the charter brokers or plane enthusiasts to whom Cirrus Aviation and Cirrus Aircraft market—would not second guess a $3 million plane ticket or $340,000 plane.  People looking to buy a plane—even if they are not experts or enthusiasts—must also consider training, storage, and maintenance, making it unlikely that they would purchase a plane without researching it.  Similarly, the charter brokers and travel managers who make up the bulk of Cirrus Aviation's sales have expertise in travel arrangements and often answer to discerning clients.  It is difficult to imagine that one of these brokers might accidentally buy their client a plane, instead of a flight.  This factor weighs in favor of Cirrus Aviation.

### G.    Intent in selecting the mark

This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark.[154]  When an alleged infringer knowingly adopts a mark like another's, courts will presume an intent to deceive the public.[155]  Absence of malice is no defense.[156]  In the case of forward confusion—where consumers believe that goods or services bearing the junior mark came from or were sponsored by the senior mark holder—the court asks whether the defendant, in adopting its mark, intended to capitalize on the plaintiff's goodwill.[157]

This factor favors Cirrus Aviation.  Cirrus Aircraft asks the Court to narrowly focus on 2010, when the Woods family bought Great Western Air and began operating it under the new entity and plaintiff in this matter, Cirrus Aviation Services, LLC.[158]  By 2010, Cirrus Aircraft had

---

[152] ECF No. 173 at 91:20-92:17, 94:4-6.

[153] ECF No. 174 at 161:13-20.

[154] *Ironhawk*, 2 F.4th at 1167-68 (citing *JL Beverage*, 828 F.3d at 1111-12).

[155] *JL Beverage*, 828 F.3d at 1111-12.

[156] *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1132 n.12 (9th Cir. 1998).

[157] *Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 932, 934 (9th Cir. 2017).

[158] ECF No. 173 at 204:5-205:22.

1   been producing its SR20 and SR22 planes for about ten years—which planes enjoyed significant

2   popularity—and had already announced its intent to develop the Vision Jet.[159]  And by 2010, the

3   Woods family was aware of Cirrus Aircraft.[160]

4        But Cirrus Aircraft oversimplifies the story.  While Cirrus Aviation, LLC officially

5   adopted its name in 2010, Milt Woods had adopted the Cirrus name for his other company in

6   1994.[161]  This was before Cirrus Aircraft obtained its first FAA certification and before Cirrus

7   Aircraft's trademark registration was approved.[162]  Milt, Mark, and Greg Woods each testified

8   that, when Milt Woods first began using the Cirrus name in 1994, none of them had heard of

9   Cirrus Aircraft.[163]  Arguably, Cirrus Aviation adopted the Cirrus mark in 1994, without

10   knowledge of Cirrus Aircraft's trademark.

11        But even if the Court accepts Cirrus Aircraft's argument that the only adoption that counts

12   is when Cirrus Aviation adopted the name in 2010, Cirrus Aviation has advanced reasonable

13   arguments that it did not intend to capitalize on Cirrus Aircraft's goodwill.  Greg Woods

14   explained that his family picked the name because his father liked the name, was proud of it, and

15   wanted to keep using it.[164]  Given the history of the Woods family's use of the name, the Court

16   finds that explanation to be credible.  And because Cirrus Aircraft only offered its SR20 and

17   SR22 models—single-engine propeller aircrafts with four or five seats[165]—in 2010, it is not clear

18   to the Court that Cirrus Aviation's fledgling charter operation would have benefited from being

19   associated with Cirrus Aircraft.  This factor weighs in favor of Cirrus Aviation.

20

21

22   _____

[159] ECF No. 108 at 3; ECF No. 174 at 125:14-19.

23   [160] ECF No. 173 at 207:14-21, 210:9-16; Ex. 164 at 41:16-42:21; Ex. 165 at 51:6-52:6.

24   [161] Ex. 1003.

25   [162] Ex. 164 at 41:16-42:21; Ex. 165 at 51:6-14; ECF No. 173 at 134:11-16; ECF No. 175 at 185:2-13, 187:9-14; ECF No. 108 at 3.

26
[163] Ex. 164 at 41:16-42:21, Ex. 165 at 51:6-14; ECF No. 173 at 134:11-16.

27   [164] ECF No. 173 at 58:12-21.

28   [165] ECF No. 108 at 3.

1        **H.      Likelihood of expansion of the product lines**

2        In the context of non-competing goods, a "strong possibility" that either party may expand

3   his business to compete with the other will weigh in favor of finding that the present use is

4   infringing.[166]  Concrete evidence of an expansion plan is relevant to this factor.[167]  Expressing

5   interest in expanding is insufficient because "mere speculation is not evidence."[168]

6        As a preliminary matter, the Court does not find Cirrus Aircraft and Cirrus Aviation to be

7   competitors.  As discussed more fully above, the companies sell to different classes of purchasers

8   and offer their ancillary services only to their customers.  Cirrus Aircraft sells planes to people

9   who want to pilot their own planes.  Cirrus Aviation sells plane tickets to people who want to be

10  passengers.  And even though the two offer identical ancillary services of acquisition,

11  maintenance, management, and pilot training services, because neither company offers them to

12  the public, these services are not competitive.

13       The Court also is not convinced that either company will expand to compete with the

14  other.  The Court has received no evidence that Cirrus Aviation intends to manufacture aircraft.

15  And Cirrus Aircraft, because of its foreign ownership, cannot legally hold the Part 135 certificate

16  required under FAA regulations to operate charter flights.[169]

17       Cirrus Aircraft nonetheless argues that it has always had an interest in entering the charter

18  market, as evidenced by its on-demand pilot programs through which it connects Cirrus Aircraft

19  plane owners with a pilot.[170]  But the contracts through which Cirrus Aircraft plane owners enter

20  into those programs explicitly state that the pilots may not fly as charter pilots under Part 135.[171]

21  Cirrus Aircraft also relies on the fact that certain Part 135 charter operations include its planes in

22

23  ───────────────

    [166] *Ironhawk*, 2 F.4th at 1168.

24  [167] *Surfvivor Media, Inc. v. Survivor Production*, 406 F.3d 625, 634 (9th Cir. 2005).

25  [168] *Id.*

26  [169] ECF No. 174 at 104:21-106:3; 14 C.F.R. § 119.33 (providing that air carriers operating under Part 135 must be citizens of the United States).

27  [170] ECF No. 174 at 86:6-9, 135:14-136:15, 162:3-15; Exs. 20, 61-63, 66-67, 78.

28  [171] Exs. 62 at § 1.1; 63 at § 1.1; 78 at § 1.

their fleets to argue that it participates in the charter market.[172]  But selling planes to charter companies is not the same as competing in the charter market.  If it was, Cirrus Aircraft would not sell its planes to a competitor.

Finally, Cirrus Aircraft has not offered concrete plans of expanding into charter.  As Cirrus Aviation points out, although no legal obstacle prevents Cirrus Aircraft from becoming a charter broker, it has never brokered charter flights.  And although it asserts that it is interested in expanding into charter, absent more concrete evidence, Cirrus Aircraft's intent is speculative.  This factor weighs in favor of Cirrus Aviation.

## I.   Weighing the factors together

Weighing these factors together, the analysis weighs in favor of judgment for Cirrus Aviation.  While the Court finds the strength of the mark to be a neutral factor and the similarity of the marks to favor Cirrus Aircraft, the remaining six factors weigh in favor of Cirrus Aviation, even if slightly so.  Cirrus Aircraft did not meet its burden of proving its claims by a preponderance of the evidence.  As a result, the Court finds that Cirrus Aviation has not infringed on Cirrus Aircraft's trademark or engaged in unfair competition.  The Court thus cannot award Cirrus Aircraft its damages or injunctive relief.

## Conclusion

Based on these findings of fact and conclusions of law, and with good cause appearing and no reason for delay, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that **final judgment is entered in favor of Plaintiff Great Western Air, LLC dba Cirrus Aviation Services, LLC and against Defendant Cirrus Design Corporation.**  The Clerk of Court is kindly directed to ENTER FINAL JUDGMENT and CLOSE THIS CASE.

DATED: January 6, 2023

_____
DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE

---

[172] Ex. 152 at 1-5.